IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL MBUGUA,                 §
TDCJ-CID NO.1439672,         §
              Petitioner,      §
v.                               §         CIVIL ACTION NO. H-11-1821
                              §
RICK THALER,                §
              Respondent.     §

## OPINION ON DISMISSAL

Petitioner Michael Mbugua, an inmate incarcerated in the Texas Department of Criminal Justice – Correctional Institutions Division ("TDCJ-CID"), has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his felony conviction for murder.  (Docket Entry No.1).  Respondent has filed a motion for summary judgment.  (Docket Entry No.18).  Petitioner has filed a response to the motion.  (Docket Entry No.21).  After considering all of the pleadings and the entire record, the Court will grant respondent's motion for summary judgment and dismiss this habeas petition.

## I. BACKGROUND AND PROCEDURAL HISTORY

A jury in the 339th Criminal District Court of Harris County, Texas, heard the following evidence in cause number 1068887, as summarized in pertinent part by the First Court of Appeals for the State of Texas:

> Kimberly Watkins and Blair Brown were driving westbound on West Bellfort in Houston, Texas on the night of May 13, 2006, when they saw complainant lying facedown in the road.  They stopped at an Auto Zone store parking lot, and Watkins exited the car to help the complainant.  When Watkins approached him, she saw that he was covered in blood.  She bent down to check on him and touched his neck.  He was breathing and making a humming sound, but was not moving or speaking and did not respond to her. Watson stood up and waved her arms to deter cars from accidentally hitting him, turning around occasionally to check on the complainant.  Brown was trying to call 9-1-1; she had borrowed a cell phone from a Pizza Hut delivery driver in the same parking lot, but the phone was not working properly. Within a minute or so, Watson saw a young man come across the street and approach the complainant, and she asked him if the complainant "was okay."

He did not answer her and, when she turned, she saw him stabbing the complainant with a knife-first in the back about five times, and then lifting the complainant's head and slitting his throat twice.  Brown also saw the attack.  The man then stepped back calmly, dropped the knife, and slowly walked away.  According to Brown and Watson, the complainant did not have a weapon.  After the assault, other cars stopped, and Brown was able to borrow another person's cell phone and place a call to 9-1-1.

After the ambulance arrived, Watson noticed a vehicle across the street in someone's front lawn, as if an accident had occurred.  The vehicle was on the opposite side of the street from the Auto Zone and on the same side of the street from whence the assailant had come.

The complainant, later identified as Bruce Caldwell, Jr., died from his injuries.  Brown and Watson were able to give a description of the assailant to the police, but neither was able to identify him from a police photographic spread.

Houston Police Department Sergeant Mark Newcomb investigated the murder scene and noticed that a car had driven up onto a nearby lawn, hitting some landscaping in the yard.  The keys were still in the car, the passenger side door was open, and there was blood in the car and a trail of blood leading from the car to the spot on the street where the complainant was attacked.  Two knives were recovered from the scene, and another was later found in the car.[FN2]  A piece of human finger was later recovered from the driver's seat of the vehicle.

> FN2  The blood found on the blade from one knife contained the complainant's blood and the other contained a mixture of appellant's and the complainant's blood.

Newcomb determined that the wrecked vehicle was registered to appellant and went to appellant's home around 2:30 a.m. on the same night of the incident, but did not find him.  The next day, Newcomb spoke to appellant by telephone.  At that time, appellant was at his parents' home, being treated by emergency medical technicians for an injury to his hand.  Appellant agreed to make a statement and was transported by the police to the Homicide Division, where appellant gave a videotaped oral statement regarding the incident.

In his statement, appellant explained that he and the complainant had been traveling to Wal-Mart in appellant's car, which appellant was driving.  He and the complainant were talking about business, but appellant felt that, "between the lines," the complainant was talking about how he was going to kill appellant.

Appellant said that he and the complainant had been partners in the music business,[FN3] but the complainant had broken the partnership by trying to kill him.  According to appellant, the complainant had felt it necessary to put a

price on appellant's head, had "a lot of people . . . coming to [appellant's] house trying to kill" appellant, and had told appellant that he was going to kill him, his mother was going to kill him, his father, a police officer,[FN4] was going to kill him, and other people were going to kill him. The complainant had threatened appellant periodically over the previous few weeks. Appellant carried two knives in his car for personal protection. Appellant never reported these threats to the police.

> FN3.  Appellant and the complainant were neighbors, had been "best friends" since 1995, and had been involved in the rap music business together since 2005.

> FN4.  The complainant's father was an officer with the Sugar Land Police Department.

The night of the incident, appellant and the complainant "got into an altercation" and appellant "had to pull out [his] knife." He did not know if the complainant had a weapon; he did not see one. Appellant stabbed the complainant twice in the arm or shoulder. During the scuffle, the complainant cut appellant, injuring him. The complainant grabbed the steering wheel, he turned the car into the yard and they hit a curb. The complainant then jumped out of the car and ran. Appellant followed the complainant into the median to find out what was wrong with him, to see if he was all right, and to help him; he made it within a few feet of the complainant, but ran when he heard someone rack a shotgun. He kept running because he was afraid that someone was trying to kill him and he walked all night, finally arriving at his parents' house. He expressed surprise in learning from the interviewing officer that the complainant was dead, said, "Damn," repeatedly, and asked, "So what am I looking at?" When the officer asked appellant why he stabbed the complainant in the median, he answered, "I don't even remember," and when the officer asked appellant if he did not remember stabbing the complainant after leaving the car, appellant answered, "Damn."

After the interview, Newcomb went down to the second floor of the same building, signed a formal complaint charging appellant with murder, and then, once the complainant went to the clerk's office, arrested appellant, who was booked in and charged with murder.

Appellant filed a motion to suppress the oral statement, which was denied after a hearing. The videotaped oral statement was played to the jury at appellant's trial, over appellant's objection.[FN5] At trial, appellant asserted a claim of self-defense and called two witnesses. The first was his mother, who testified about appellant's fear that the complainant was going to kill him, his arrival at home in the early hours on the morning after the incident, and police actions on the night of the incident and the following morning, as they searched for appellant at his home and ultimately took him to the police station to make a statement. His second witness was Dr. Vincent Di Maio, a forensic pathologist, who testified that the complainant was likely killed by

the wound to the heart, not the wounds to the neck and that appellant's wounds were consistent with being defensive wounds.[FN6]  Appellant did not testify.

> FN5.  The State also called Brown, Watson and Newcomb at trial, along with three other officers who were relevant to the taking of the oral statement; a forensic pathologist, who discussed the autopsy of the complainant; two friends and business associates of the complainant, who discussed the relationship between appellant and the complainant; a police officer assigned to the crime scene unit, who described the scene of the incident and sponsored evidence from the scene; a latent print examiner, who stated that she was unable to find sufficient fingerprints to make an identification; a district attorney investigator, who had taken a buccal swab from appellant and delivered it to the crime lab; and an analyst from the crime lab, who testified regarding blood found on various items at the scene that was consistent with the genetic profile of the complainant, appellant, or a mixture of both.

> FN6.  The State called two witnesses in rebuttal-a friend of the complainant and a neighbor-who both offered opinion and reputation testimony regarding whether the complainant was a peaceful and law-abiding person.  Appellant then called his mother in rebuttal to give opinion and reputation testimony regarding whether he was a peaceful and law-abiding person.

*Mbugua v. State*, 312 S.W.3d 657, 660-62 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).  The jury convicted petitioner of murder and, on May 22, 2007, after a punishment hearing, the jury sentenced him to confinement for life in TDCJ-CID.  (Docket Entries No.14-39, page; No.14-52, pages 23-24).

On direct appeal, petitioner complained that the state district court erred by

1.   Denying his motion to suppress his statement when he clearly invoked his right to an attorney;

2.   Failing to submit written findings of fact and conclusions of law based on petitioner's properly filed motion to suppress;

3.   Failing to suppress his statement because he was in custody at the time it was given and he was not given his *Miranda* warnings;

4.   Failing to give a jury instruction pursuant to article 38.23(a) of the Texas Code of Criminal Procedure regarding petitioner's custody status at the time he gave his statement; and,

> 5.   Redacting portions of petitioner's medical records, which noted that petitioner's injuries had been sustained in a fight.

(Docket Entry No.14-6, page 4).   The First Court of Appeals for the State of Texas affirmed the judgment of the state district court.   *Mbugua*, 312 S.W.3d at 661-671.   Petitioner petitioned for discretionary review on the sole issue that the court of appeals ignored state law precedent in determining that petitioner's invocation of his right to counsel was ambiguous.   (Docket Entry No.14-4, page 7).   On March 17, 2010, the Texas Court of Criminal Appeals refused petitioner's petition for discretionary review.   (Docket Entry No.14-1, page 4).

> Petitioner sought state habeas relief from his conviction on the following grounds:

> 1.   He was denied the effective assistance of counsel during the hearing on the motion to suppress because his trial counsel (a) did not preserve error by objecting to the police officers' failure to given petitioner his *Miranda* warnings during a custodial interrogation and petitioner's invocation of his Fifth Amendment right to terminate questioning and remain silent during custodial interrogation; and (b) did not request an Article 38.22 general voluntariness instruction during the motion-to-suppress hearing; and,

> 2.   He was denied the effective assistance of counsel on appeal because his appellate counsel did not raise on direct appeal issues regarding the state district court's failure to given the jury an instruction on sudden passion and the voluntariness of his statement to police.

(Docket Entry No.14-51, pages 8-22).   The state district court, sitting as a habeas court, recommended that relief be denied and entered written findings.   (Docket Entry No.14-52, page 2-3).   The Texas Court of Criminal Appeals denied the application without a written order on the findings of the trial court without a hearing.   (Docket Entry No.14-51, page 2).

> Petitioner seeks federal habeas relief on the following grounds:

> 1.   The state district court violated his right against self-incrimination and the Texas Code of Criminal Procedure by admitting non-*Mirandized* custodial statements into evidence;

> 2.   He was denied the effective assistance of counsel at trial because his trial counsel did not (a) preserve error on issues regarding the police officers' failure to administer *Miranda* warnings to him before engaging in custodial interrogation and the officers' failure to

terminate questioning during custodial interrogation; and (b) did not request an Article 38.22 general voluntariness instruction at the suppression hearing; and,

3.   He was denied the effective assistance of counsel on appeal because his appellate counsel filed to raise two issues, *i.e.,* the trial court's failure to instruct the jury on sudden passion and on the voluntariness of his oral statement, on direct appeal.

(Docket Entries No.1, No.2).

Respondent moves for summary judgment on grounds that petitioner has failed to meet his burden of proof under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") and his claims fail on the merits.  (Docket Entry No.18).

## II. DISCUSSION

In deciding a motion for summary judgment, a court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56.  The moving party bears the initial burden of informing the court of the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial.  *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001).  Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact."  *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

The AEDPA, codified as amended at 28 U.S.C. § 2254(d), "substantially restricts the scope of federal review of state criminal court proceedings."  *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *Bell v. Cone*, 535 U.S. 685, 693 (2002) (noting that the AEDPA has "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible

under the law"). Specifically, the AEDPA prohibits federal habeas relief unless the state adjudication of the claim either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2); *Berghuis v. Thompkins*, --U.S. --, 130 S.Ct. 2250, 259 (2010). AEDPA also requires the court to presume that the state court's findings of fact are correct "unless the petitioner rebuts that presumption by clear and convincing evidence."[1] *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)). "The presumption of correctness not only applies to the explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Id.* at 948 n.11.

A state court need not cite to, nor even be aware of, applicable Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002). Nor does this court review the reasoning of the state court. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Rather, the court's review is limited to the "ultimate legal conclusion" of the state court. *Id.* The court is to determine "what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, --U.S.--, 131 S.Ct. 770, 786 (2011).

Courts construe pleadings filed by *pro se* litigants under a less stringent standard than those drafted by attorneys. *Haines v. Kerner*, 404 U.S. 519 (1972); *Bledsue v. Johnson*, 188

---

[1] While Rule 56 of the Federal Rules regarding summary judgment applies generally "with equal force in the context of habeas corpus cases," *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000), it applies only to the extent that it does not conflict with the habeas rules. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004). Therefore, section 2254 (e)(1), which mandates that findings of fact made by a state court are presumed correct, overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the non-moving party. *Id.* Unless the petitioner can "rebut[] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct. *Id.*

F.3d 250, 255 (5th Cir. 1999).   Thus, *pro se* pleadings are entitled to a liberal construction that includes all reasonable inferences that can be drawn from them.   *Haines*, 404 U.S. at 521. Nevertheless, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion.   *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

### A. Admission of Oral Statement

Petitioner contends the state district court violated his right against self-incrimination and the Texas Code of Criminal Procedure by admitting his non-*Mirandized* custodial statement into evidence.   (Docket Entries No.1, pages 7, 14-15; No.2-1, pages 2-8).   He further contends that the state appellate court affirmed the state district court's admission of his statement and that such affirmation was contrary to, and an unreasonable application of clearly established federal law.[2] (Docket Entry No.2-1, pages 4-5).

Petitioner, however, did not exhaust this claim in state court.   A state prisoner must generally exhaust all available state remedies before proceeding in federal court.   28 U.S.C. § 2254(b).   To fully exhaust, a petitioner, must fairly present the factual and legal basis of any claim to the highest available state court for review prior to raising it in federal court.   *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004).   In Texas, all claims must be presented to and ruled on by the Texas Court of Criminal Appeals.   *Tigner v. Cockrell*, 264 F.3d 521, 526 (5th Cir. 2001).

In this case, petitioner sought discretionary review from the state appellate court's decision on the sole issue that the court of appeals ignored state law precedent in determining that petitioner's invocation of his right to counsel was ambiguous.   (Docket Entry No.14-4, page 7).   In

---

[2] The state appellate court did not address the custody issue and declined to address issues related to the timing of the administration of *Miranda* warnings because petitioner's trial counsel did not preserve the error for review.   *Mbugua*, 312 S.W.3d at 666-67.   The state appellate court affirmed the trial court's finding that petitioner did not invoke a clear and unambiguous right to counsel.   *Id.* at 665.

state habeas proceedings, petitioner raised only ineffective assistance of counsel claims, albeit on analogous grounds.  (Docket Entry No.14-51, pages 13-21).

Even if petitioner had exhausted this claim under Articles 38.22 and 38.23 of the Texas Code of Criminal Procedure, this court would defer to the state courts' determination of the issue.  "Under § 2254, federal habeas courts sit to review state court misapplications of *federal* law. A federal court lacks authority to rule that a state court incorrectly interpreted its own law." *Charles v. Thaler*, 629 F.3d 494, 500-01 (5th Cir. 2011) (emphasis in original).

Likewise, if petitioner had exhausted his claim that the state court's decision to admit his incriminating statements to law enforcement personnel during custodial interrogation violated his right against self-incrimination, he would not be entitled to federal habeas relief because, as respondent argues, the record does not show that petitioner's incriminating statements were a product of custodial interrogation or that he made an unambiguous request for counsel.  (Docket Entry No.18, page 27).

Because the inherently coercive nature of custodial interrogation "blurs the line between voluntary and involuntary statements,"[3] the Supreme Court "in *Miranda* adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination."  *J.D.B. v. North Carolina*, --U.S.--, 131 S.Ct. 2394, 2401 (2011) (citation omitted). "Prior to questioning, a suspect 'must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'"  *Id.* at 2401 (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  If a suspect makes an inculpatory statement during custodial interrogation, the Government must show as a prerequisite to the statement's admissibility as evidence, that the defendant "'voluntarily, knowingly and intelligently' waived his rights."  *Id.* quoting *Miranda*, 384 at 475-76.  Such measures, however, are required "only where there has been such a restriction on a

---

[3] *Dickerson v. U.S.*, 530 U.S. 428, 435 (2000)).

person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994).  In determining whether a suspect is in custody under *Miranda*, a court first examines the circumstances surrounding the interrogation and asks, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.  *J.D.B.,* 131 S.Ct. at 2402.  The court then applies an objective test to resolve the ultimate inquiry:  was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

To determine how a suspect would gauge his freedom of movement, a court examines "all of the circumstances surrounding the interrogation."  *Stansbury*, 511 U.S. at 325. "Relevant factors include the location of the questioning, . . its duration, . . statements made during the interview, the presence or absence of physical restraints during the questioning, . . and the release of the interviewee at the end of questioning." *Id.* citations omitted.  A determination that an individual's freedom of movement was curtailed does not end the custody inquiry.  "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Id.*; *see Howes v. Fields*, --U.S.--, 132 S.Ct. 1181, 1189-90 (2012) (noting person detained for traffic stop is not in custody for purposes of *Miranda*); *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (noting that "[c]ustody for *Miranda* purposes requires a greater restraint on freedom than seizure under the Fourth Amendment").

Moreover, "a noncustodial situation is not converted to one in which *Miranda* applies" simply because "the questioning took place in a 'coercive environment.'"  *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977).

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.  But police officers are not required to administer *Miranda* warnings to everyone whom they question.  Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police

suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

*Id*. at 495.

A reasonable person for purposes of *Miranda* is neutral to the environment and to the purposes of the investigation, *i.e.* he or she is "'neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances.'" *Id*. quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988). "[T]he subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *J.D.G.*, 131 S.Ct. at 2402 (internal quotation marks omitted).

The record, in this case, supports the state district court's conclusion that petitioner was not in custody for *Miranda* purposes at the beginning of questioning. Petitioner voluntarily went to the police station upon request.[4] He was treated as a visitor-witness and not as a suspect by the police.[5] He acknowledged that he was not under arrest upon his arrival at the police station. *See Mathiason*, 429 U.S. at 495. He was informed numerous times that he was not under arrest and that the officers would terminate their interview if wanted an attorney or if he did not want to talk with them. He was told that any statement that he gave must be voluntary. He was informed that he had

---

[4] The record shows that several Missouri City uniformed officers were dispatched to petitioner's residence in Missouri City, Texas around noon the day after the murder to assist the Missouri City Fire Department, which had dispatched an ambulance to the residence. (Docket Entry No.14-18, pages 140-143). At the request of City of Houston Police Sergeant Mark Newcomb, one Missouri City officer approached petitioner with a phone and told him that Newcomb wanted to speak to him. (*Id.*, page 146). While the officer could not hear their conversation, he heard petitioner agree to the request being made. (*Id.*, page 148). Newcomb informed the attending officer by phone that petitioner had agreed to a courtesy transport to a City of Houston Police Department sub-station and that the officers should treat petitioner as a witness and not a suspect. (*Id.*, page 149). Another uniformed Missouri City police officer then transported petitioner to the sub-station un-cuffed in the back of his marked police vehicle. Approximately forty minutes later, petitioner arrived at the City of Houston Police Department sub-station, where he was met by a City of Houston police officer. This officer escorted petitioner to the front passenger seat of his marked patrol car and transported him to the Homicide Division of the City of Houston Police Department. (Docket Entries No.14-18, pages 150-51, 178; No.14-19, pages 1-8).

[5] Petitioner was met at the station by Officer Tony Huynh, who was Sergeant Newcomb's partner. (Docket Entry No.14-19, page 7). Petitioner was given a visitor's pass and escorted un-cuffed to an interview room. (Docket Entry No.14-19, pages 54-59). Before the interview, petitioner was offered something to eat, given water, and allowed to use the restroom. (*Id.*, page 61). Neither Newcomb nor Huynh carried a weapon or wore a badge inside the interview room. (*Id.*, pages 61-64).

not been charged with a crime but that the officers were aware that he had been seen running from the scene and that his car had been found at the scene.  While he was not allowed to call his parents or to use the phone during the interview, the officers affirmatively explained to him that questioning would cease if he invoked his right to counsel or refused to answer questions.[6]  The interview with

---

[6] The transcript of petitioner's video-taped interview at the police station with Newcomb, which was before the state district court at the suppression hearing, shows that Newcomb initially confirmed that petitioner did not need immediate medical care, that he had an opportunity to use the bathroom and to have a drink of water, that he understood that he was not under arrest, and that he wanted to speak with police.  (Docket Entry No.14-36, pages 6-8).  Thereafter, the interview proceeded as follows, in pertinent part:

[Newcomb]:     And you are here voluntarily, right?  Is that correct?  You are down here because you want to talk to us; is that correct?

[Petitioner]:     No.

[Newcomb]:     No?  You don't want to talk to us?

[Petitioner]:     Huh-uh.

[Newcomb]:     Okay.  My understanding was, when I talked to you on the phone earlier, that you want to – you want to speak to us?

[Petitioner]:     I thought I was being –I thought I was arrested, but I'm not arrested.  So. . .

[Newcomb]:     No, you're not under arrest at this time.  So, this is your opportunity to give your side of the story on what happened, okay?

                      So, you're not under arrest at this time.  You understand that?

[Petitioner]:     Yes, sir.

[Newcomb]:     Okay.  Because you haven't been placed in handcuffs; is that correct?  You have not been placed in handcuffs, right?

[Petitioner]:     Yes.

[Newcomb]:     Okay.  And you're – nobody has told you you're under arrest or anything like that, right?  We just provided you transportation down here to Travis; is that correct?

[Petitioner]:     Yes.

[Newcomb]:     Okay.  So you are not under arrest. We just want to get your side of the story on what happened, okay?

[Petitioner]:     Okay.

[Newcomb]:     And so, do you—you want to continue to talk to us and speak with us; is that correct?

[Petitioner]:     Can I wait until my lawyer gets here?

| | |
|---|---|
| [Newcomb]: | Okay. If—if you want to talk to a lawyer, we'll have to cut off the interview right now.  We can't ask you anything else.  We can't speak to you anymore, and you will not have an opportunity to give your side of the story. |
| [Petitioner]: | Then what's going to happen? |
| [Newcomb]: | I'm sorry? |
| [Petitioner]: | What's going to happen? |
| [Newcomb]: | Well, from that point I'll have to go make some phone calls, and I'll get back with you.  But if you are refusing to speak with us and you want an attorney, if that's what you're saying, then we're going to get up, we're going to walk out of this room and that's what—the end of the conversation.  Now you are not under arrest at this time.  So you don't have to have an attorney if you are not under arrest, okay?  So— |
| [Petitioner]: | Can I call my parents so I can [sic] I feel more comfortable talking to my parents here because they know—they know the story too. |
| [Newcomb]: | Yeah. Well, since you are an adult, we want to speak with you.  You are 21 years – 20, 21 years of age – |
| [Petitioner]: | Still, my parents, they know – |
| [Newcomb]: | Yeah – |
| [Petitioner]: | They know the story. |
| [Newcomb]: | I understand that; but you are 20, 21 years of age. |
| [Petitioner]: | Uh-huh. |
| [Newcomb]: | --and we want to speak to you alone; and that's the way we prefer to do it, since you are an adult.  If you were a juvenile, then it would be different.  But you were there, you know what happened, and you have the story; and we want to hear it from your mouth first, not from your parents who heard the story from you. |
| [Petitioner]: | So, what's going to happen if I tell you the story? |
| [Newcomb]: | Well, I'll talk to you after you get through telling me exactly what happened.  We will discuss it and see.  We have to get your side of the story because we have to know what happened; and until we get your side of the story, um, you know, we don't know what happened. |
| | So, you may have a legitimate reason to explain everything that happened out there; and if you do, we need to hear it.  But if you say:  Hey, I want an attorney, we're going to get up, we're going to walk out of this room; and we're done with you, okay? |
| [Petitioner]: | And then what's going to happen after that? |
| [Newcomb]: | Well, I – to be quite frank with you, I'm not going to discuss it anymore with you, after we walk out of the room.  Because if you want an attorney, I'm not going to have anything else to say to you, okay? |

Newcomb and Huynh began at 1:45 p.m. and concluded almost forty-five minutes later at 2:26 p.m. (Docket Entry No.14-36, pages 6, 50).   Petitioner was not restrained during the entire interview. (*Id.*, page 8).

---

|  |  |
|---|---|
|  | So, the best thing, I think, in my opinion for you to do is have a dialogue with us.  We can talk about this.  This is your one opportunity to give your side of the story on what happened.  If you refuse to do that, then you've lost that opportunity, okay? |
| [Petitioner]: | Hmm. |
| [Newcomb]: | So, let me ask you again:  Do you wish to speak with us?  You are not under arrest.  Do you want to tell us what happened out there? |
| [Petitioner]: | Uh, well, we was [sic] driving – |
| [Newcomb]: | Okay.  That's great, but let me ask you:  You do not want an attorney right now:  is that correct?  You want to talk to us? |
| [Petitioner]: | Well – |
| [Newcomb]: | Is that correct? |
| [Petitioner]: | I don't know what my options are. |
| [Newcomb]: | Well, you are not under arrest.  So, you don't need an attorney.  I want you to understand that, but I want you to tell me that you're – you are telling me this voluntarily; is that correct? |
| [Petitioner]: | Um, can I make a phone call first? |
| [Newcomb]: | Well, we're not going to allow you to make a phone call right now.  We're going to just have you talk to us right here, okay?  But we're not going to allow you to make a phone call right now.  You certainly can make a phone call after you talk to us.  I promise you that.  I will make you that promise that you can make a phone call, okay? |
| [Petitioner]: | So, what are the charges against me? |
| [Newcomb]: | Nothing right now.  Nothing.  Not at this time.  There's nothing against you, okay?  So – |
| [Petitioner]: | Why am I here? |
| [Newcomb]: | Why, well, because your car was out there at the scene on West Bellfort, okay?  Your car was there.  And from all indications that we have, you were seen leaving that scene, running from the scene.  So, we need to know what happened in the car.  Are you willing to tell us? |
| [Petitioner]: | Yeah. |

(Docket Entry No.14-36, pages 7-12); *see also Mbugua*, 312 S.W.3d at 664-665.

After the aforementioned exchange with the police officers, petitioner admitted that he stabbed complainant in the car, that complainant ran out of the car to the median, and he followed complainant to help him.  (Docket Entry No.14-36, pages 12-15).  Before he engaged in more detailed questioning, Sergeant Newcomb administered the warnings required by *Miranda* and Article 38.22, section 2 of the Texas Code of Criminal Procedure to petitioner.[7]  (*Id*., pages 15-21).  After some discussion about these rights and waiver, petitioner affirmatively agreed to waive them.  (*Id*.).  Thereafter, petitioner gave more detailed incriminating statements about his involvement in the murder.  (*Id.*, pages 22-42).

Based on this record, the Court concludes that a reasonable person in petitioner's position could conclude that before admitting that he stabbed complainant, he could have terminated the interview and departed.   Because petitioner was not subjected to custodial interrogation before he confessed, the state district court did not err in admitting his statement at trial.

Likewise, petitioner was not in custody at the time he informed the investigating officers that he came to the station because he thought he was under arrest and not because he wanted to give a statement.[8]   His response of "huh-uh" to clarifying questions was not an unambiguous invocation of his right to remain silent.  *See Berghuis v. Thompkins*, --U.S.--, 130 S.Ct. 2250, 2259-260 (2010) (requiring an unambiguous invocation of right to remain silent); *Miranda*, 384 U.S. at 474-75 (holding if suspect "indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease").   Nor has petitioner shown that the state appellate court's determination that he did not invoke his right to counsel when he asked if he could wait for counsel was an unreasonable application of clearly

---

[7] Section 3 of Article 38.22 requires that no electronic recording of an oral statement made as a result of custodial interrogation is admissible against a criminal defendant unless prior to the statement but during the recording, the accused is given the warnings in subsection (a) of section 2 of Article 38.22, which includes the warnings required by *Miranda v. Arizona*.  TEX. CODE CRIM. P. ANN. art. 38.22, §§ 2, 3 (Vernon 2005).

[8] *See* n. 6.

established federal law.  *See Davis v. United States,* 512 U.S. 452, 459 (1994) (holding that a suspect must invoke the *Miranda* right to counsel unambiguously).  Accordingly, petitioner is not entitled to federal habeas relief on this claim under the AEDPA.

B. Ineffective Assistance of Counsel

Petitioner complains that he was denied reasonably effective assistance of counsel at trial and on direct appeal.  (Docket Entries No.1, No.2).  The relevant state-court decision is the Texas Court of Criminal Appeals' decision denying state habeas relief on petitioner's ineffective assistance of counsel-claims on the trial court's findings without a hearing.  *See Berghuis*, 130 S.Ct. at 2259.

1. Trial Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel.  U.S. Const. amend. VI.  A federal habeas corpus petitioner's claim that he was denied effective assistance of trial counsel is measured by the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail on an ineffective assistance of counsel claim, petitioner must establish that his counsel's performance was deficient and that the deficiency prejudiced his defense.  *Ogan v. Cockrell*, 297 F.3d 349, 360 (5th Cir. 2002) (citing *Strickland*, 466 U.S. at 692).  The failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.  *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).  A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other.  466 U.S. at 697.

Counsel's performance is deficient when the representation falls below an objective standard of reasonableness.  *Ogan*, 297 F.3d at 360.  Judicial scrutiny of counsel's performance must be "highly deferential," indulging in a "strong presumption" that "trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy."  *West v. Johnson,* 92 F.3d 1385, 1400 (5th Cir. 1996).  To overcome this presumption, a petitioner

16

"must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1993).

Counsel's deficient performance results in actual prejudice when a reasonable probability exists "that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*   "Where a defendant challenges his conviction, he must show that there exists 'a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'"  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 695).   "In determining the existence *vel non* of prejudice, the court 'must consider the totality of the evidence before the judge or jury.'"  *Id.* Confidence in the outcome of the trial is undermined when counsel's deficient performance renders "the result of the trial unreliable or the proceeding fundamentally unfair."  *Pratt v. Cain*, 142 F.3d 226, 232 (5th Cir. 1998) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).   "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him."  *Pratt*, 142 F.3d at 232 (quoting *Lockhart*, 506 U.S. at 372).   "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."  *Kimmelman*, 477 U.S. at 374.

In this case, the state district court, sitting as a habeas court, generally found that petitioner failed to demonstrate by a preponderance of the evidence that his trial counsel's performance was deficient or prejudicial; it did not make specific findings as to the specific issues petitioner presented in his state habeas application.  (Docket Entry No.14-52, page 2).  The state habeas court further found that "[t]he totality of the representation received by the applicant at trial was sufficient to protect his right to reasonably effective assistance of counsel."  (*Id.*, page 3).  The

Texas Court of Criminal Appeals affirmed such finding when it denied petitioner's state habeas application.

### a. Failure to Object

Petitioner contends that his attorney's performance at the suppression hearing was deficient because his trial counsel did not voice an objection to the police officer's failure to administer the *Miranda* warnings to petitioner at an earlier time during petitioner's custodial interrogation and to terminate questioning when petitioner invoked his Fifth Amendment right to remain silent; thus he failed to preserve these errors for direct review on appeal.   (Docket Entry No.1, page 13).   Relying on Justice Sharp's concurring opinion in the state appellate court, petitioner claims that his statement was erroneously admitted because, as Justice Sharp found, he was clearly in custody at the time he first made incriminating statements.[9]   (Docket Entry No.2, pages 25-26).   Petitioner maintains that had error been preserved, his conviction would have been set aside on direct appeal.   (*Id.*).

As previously discussed, the record supports the state district court's conclusion that petitioner was not in custody for *Miranda* purposes at the police station and was not subject to custodial interrogation until he gave his first incriminating statement and was given the required

---

[9] In his concurring opinion, Justice Jim Sharp indicated that he would expressly hold that petitioner "was clearly in custody at the time that he first made incriminating statements.   *Mbugua v. State*, 312 S.W.3d 657, 671 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).   Justice Sharp based this finding on "the detective's refusal to allow appellant to use the telephone at the time the appellant requested it and the detective's statements to appellant that officers would 'not allow' him to 'to make a phone call right now,' that officers were 'going to just have you talk to us right here,' and that appellant could make a phone call 'after you talk to us.'"   *Mbugua v. State*, 312 S.W.3d 657, 671-72 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).   Justice Sharp chastised petitioner's trial attorneys for failing to preserve "the improper admission at trial of statements made as a result of custodial interrogation without proper warnings and without a proper waiver of rights."   *Id.* at 672.   However, as Justice Sharp noted, petitioner "would undoubtedly have been convicted even without the admission of his statement" for the following reasons:

> Appellant was witnessed by a least two people in the commission of this offense. Appellant's wrecked vehicle was at the scene, complete with a clear trail from that vehicle to the decedent.   And, although forensic scientists at the Houston Police Department did not trace appellant's fingerprints to the knives found on site, there was little need to—fingerprints should be a mere footnote in a case file when a piece of the appellant's actual finger was left behind!

*Id.* at 672-73.

warnings.   Thereafter, petitioner waived his rights and confessed.   Because petitioner was not subjected to custodial interrogation before he confessed, petitioner's trial counsel had no basis for objecting that the officers did not administer the *Miranda* warnings at an earlier time; therefore, his failure to object did not constitute deficient performance under *Strickland*.[10]   Fair-minded jurists would agree that the state habeas court's findings that petitioner failed to demonstrate that his trial counsel's performance was deficient and that petitioner was afforded the reasonably effective assistance of counsel at trial were reasonable applications of federal law.

### b. Failure to Request Jury Instruction

Petitioner also complains that his trial counsel rendered in effective assistance at the suppression hearing because counsel failed to request a general voluntariness instruction pursuant to Article 38.22, section 6 of the Texas Code of Criminal Procedure with respect to petitioner's oral confession.[11]   (Docket Entries No.1, page 13; No.2, pages 36-40, No.2-1, page 1).   Respondent

---

[10] Petitioner argues that the facts of this case are "'materially indistinguishable' from the facts in *Missouri v. Seibert*, 542 U.S. 600 (2004), where police used a "question first, warn later" interrogation tactic. (Docket Entry No.21, page 5). The facts of *Seibert*, however, are markedly distinguishable from the present case. Patrice Seibert was awakened at 3:00 a.m. by a police officer at the hospital where her son was being treated for burns from a fire, in which her disabled son had died. *Seibert*, 542 U.S. at 604. She was taken to the police station, where she was questioned by the officer without *Miranda* warnings for thirty to forty minutes. *Id.* at 604-05. During questioning, the officer squeezed her arm and repeated to her that her disabled son "was meant to die in the fire." *Id.* at 605. After she admitted that she knew her disabled son was meant to die in the fire, she was given a twenty minute break. When questioning resumed, the officer turned on a tape recorder, gave her the *Miranda* warnings, obtained a signed waiver of rights from her, and confronted her with her prewarning statements. *Id.* At the suppression hearing, the investigating officer conceded that he made a "conscious decision" to withhold *Miranda* warnings and resort to an interrogation technique of question first, give warnings, and then repeat the question until he got an answer that had already been provided. *Id.* at 606.

[11] The Texas Court of Criminal Appeals has noted the types of jury instructions related to the voluntariness of a defendant's statements, as follows:

> Under Texas statutory law, there are three types of instructions that relate to the taking of confessions: (1) a "general" Article 38.22, § 6 voluntariness instruction; (2) a "general" Article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3); and (3) a "specific" Article 38.23(a) exclusionary-rule instruction. In essence, the Section 6 "general" instruction asks the jury: "Do you believe, beyond a reasonable doubt, that the defendant's statement was voluntarily made? If it was not, do not consider the defendant's confession." The Section 7 instruction sets out the requirements of 38.22, § 2 or § 3 and asks the jury to decide whether all of those requirements were met. The Article 38.23(a) "specific" instruction is fact-based: For example, "Do you believe that Officer Obie held a gun to the defendant's head to extract his statement? If so, do not consider the defendant's confession."

contends that petitioner's counsel was not ineffective in failing to request an Article 38.22, § 6 general voluntariness instruction because evidence disputing the voluntariness of petitioner's statements that would give rise to an instruction under section 6 were never presented to the jury. (Docket Entry No.18, page 19).

Article 38.22, section 6 of the Texas Code of Criminal Procedure governs the admissibility of an accused's custodial and non-custodial statements and provides that only voluntary statements may be admitted. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 2005); see *Oursbourn v. State*, 259 S.W.3d 159, 171 (Tex. Crim. App. 2008). "[T]he potential 'involuntary' fact scenarios encompassed by . . . [Article] 38.22 are broader in scope than those covered by the Due Process Clause or *Miranda*." *Oursbourn*, 259 S.W.3d at 173. Unlike the Due Process Clause and *Miranda*, which protects people from police overreaching, section 6 protects people from police overreaching, threats from private actors, and even themselves. *Id.* at 172–73.

The Court of Criminal Appeals has identified the following fact scenarios that can raise a state-law claim of involuntariness under section 6:

> (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have knowingly, intelligently and voluntarily waived his rights; (3) the suspect lacked the mental capacity to understand his rights; (4) the suspect was intoxicated, and he did not know what he was signing and thought it was an accident report; (5) the suspect was confronted by the brother-in-law of his murder victim and beaten; (6) the suspect was returned to the store he broke into for questioning by several persons armed with six-shooters.

Id. at 172–73 (footnotes and quotations omitted). The Texas Court has also suggested that "youth, intoxication, mental retardation, and other disabilities . . . are factors that a jury, armed with a proper instruction, is entitled to consider."[12] *Id.* at 173.

---

*Oursbourn v. State*, 259 S.W.3d 159, 173–74 (Tex. Crim. App. 2008).
[12] Ultimately the *Oursbourn* Court held that the appellant should have received the general voluntariness instruction because there was evidence that he was bipolar and in a depressed or manic state at time of his confession. *Id.* at 181.

Article 38.22, section 6, becomes the "law applicable to a case" once a question is raised and actually litigated as to the general voluntariness of an accused's statement; however, a factual dispute is not necessary. *Oursbourn*, 259 S.W.3d at 175–76, 180. A question of voluntariness is raised when a party notifies the trial judge or the trial judge raises the issue on his own. *Id.* at 175. The trial judge is then required to make an independent determination outside the jury's presence regarding the voluntariness of the statement. *Id.* at 175. If the trial judge decides the confession was voluntary, the confession is admitted and a party must introduce some evidence before the jury that would enable it to "find that the facts, disputed or undisputed, rendered him unable to make a voluntary statement" as contemplated by section 6. *Id.* at 175-76; *see also Estrada v. State*, 313 S.W.3d 274, 300 (Tex. Crim. App. 2010).

In this case, petitioner's trial counsel notified the state district judge of an issue regarding the voluntariness of petitioner's oral statement in his Motion to Suppress Statements. (Docket Entry No.14-7, pages 44-45). The state district court held a hearing on the motion. (Docket Entries No.14-11, No.14-12; No.14-36). At the close of the hearing, petitioner's trial counsel challenged the voluntariness of petitioner's statement under *Miranda* and Article 38.22 as follows, in pertinent part:

> And so I would argue that the Court could determine that when he is initially led all the way to the Homicide Division that he was not in custody during that time. However, I would ask the Court – again, the transcript is what it is, Your Honor. When he gets there voluntary, no, it's very clear that he thinks, even though he says to the contrary – and there I'll agree with the prosecutor. When you look at all of the actions in there, he's saying, "I wasn't here voluntarily. I don't know what's going on."
>
> As a matter of fact, Judge, all through here, even at the end, . .  when they are, you know, asking him, again, did you do this voluntarily, he's like, "No, I didn't have any other choice."

(Docket Entry No.14-12, pages 95-96).

The state district court disagreed and found that at the time the requirements of Article 38.22 of the Code of Criminal Procedure were given, petitioner understood his rights, he voluntarily waived the rights, and he voluntarily gave the statement.  (*Id.*, page 102).

During the State's case-in-chief, the jury heard Sergeant Newcomb's testimony on cross-examination outlining the chronology of the events leading up to petitioner's arrest and they viewed the videotape of petitioner's statement to the police.  (Docket Entries No.14-18; No.14-19, No.14-20; No.14-36, pages 47-52).   Petitioner contends that the following pre-warning excerpts from his videotaped oral statement raise an Article 38.22, section 6 voluntariness issue:[13]

[Newcomb]:   And you are here voluntarily, right?  Is that correct?  You are down here because you want to talk to us; is that correct?

[Petitioner]:   No.

[Newcomb]:   No?  You don't want to talk to us?

[Petitioner]:   Huh-uh.

[Newcomb]:   Okay.  My understanding was, when I talked to you on the phone earlier, that you want to – you want to speak to us?

[Petitioner]:   I thought I was being –I thought I was arrested, but I'm not arrested.  So. . .

*     *     *     *     *     *

[Petitioner]:   Um, can I make a phone call first?

[Newcomb]:   Well, we're not going to allow you to make a phone call right now.  We're going to just have you talk to us right here, okay?  But we're not going to allow you to make a phone call right now.  You certainly can make a phone call after you talk to us.  I promise you that.  I will make you that promise that you can make a phone call, okay?

---

[13]  Docket Entry No.14-36, page 7.

He also points to the following exchange that occurred while Newcomb was giving the statutory warnings:[14]

| | |
|---|---|
| [Petitioner]: | Can I make some phone calls? |
| [Newcomb]: | Yes.  And we are going to let you make a phone call when we get done.  I will make you that promise.  Okay? |
| [Petitioner]: | What about fixing my hand? |
| [Newcomb]: | We're going to get that – I'm going to get your hand fixed.  That is a promise I'm going to make to you, okay? |
| [Petitioner]: | How are you going to get it fixed? |
| [Newcomb]: | We're going to take you to the hospital and we're going to get it fixed, okay?  We're going to have them look at your hand, okay?  That's a promise I will make to you. . . .  As soon as we get done with this interview, you're going straight to the hospital; and we're going to get that look at, okay? |

Petitioner further directs the Court to the following post-warning and post-confession statements as evidence that his confession was involuntary:[15]

| | |
|---|---|
| [Newcomb]: | You volunteered this information; is that correct? |
| [Petitioner]: | Not really. |
| [Newcomb]: | Well, you waived your rights; is that correct? |
| [Petitioner]: | Well, I mean, I had no other options.[16] |

*     *     *     *     *     *

| | |
|---|---|
| [Newcomb]: | So, you are not under coercion here. . . . |
| [Petitioner] | I see badges.[17] |

*     *     *     *     *     *

---

[14] *Id.*, page 20.

[15] *Id.*

[16] *Id.*, page 48.

[17] *Id.*

[Newcomb]:   Nobody has beaten you in this room or forced you to give a statement have they?"

\*    \*    \*    \*    \*    \*

[Petitioner]:    I couldn't walk out if I wanted to.

(Docket Entry No.2, page 38).

The record and the transcription of petitioner's oral statement, however, are void of evidence showing any police coercion or overreaching that would render petitioner's statement involuntary under *Miranda* or the Due Process Clause.  *See Oursbourn*, 259 S.W. 3d at 170-71 (enumerating fact scenarios of police overreaching in cases where statements have been found involuntary).  Moreover, petitioner's excerpts do not address the voluntariness of his statement but whether he was subjected to custodial interrogation before giving his first inculpatory statement.  As previously discussed, petitioner was not in custody when first questioned by officers at the police station and, he did not invoke his right to counsel or to remain silent.

Furthermore, the record shows that after petitioner indicated that he stabbed complainant, he was given his statutory warnings and waived his rights.  In fact, after giving his statement, petitioner agreed that his statement was true and correct, that he was given the statutory warnings, and that he waived his rights.  The record also shows that petitioner was not beaten, coerced, or promised anything in exchange for his confession.  (Docket Entry No.14-36, pages 47-50).  The record is also void of evidence that petitioner made his statements to police under duress of hallucinations, illness, medication, or a private threat.

Because nothing in the trial record or petitioner's oral statement suggests that petitioner's statements to the police were made involuntarily as contemplated by section 6 of Article 38.22, petitioner was not entitled to a general voluntariness instruction.  Therefore, petitioner's trial counsel did not render ineffective assistance in failing to request or object to the omission of the instructions in the jury charge when he reasonably could have determined that the instructions were

not applicable to the case.   Accordingly, the state habeas court's findings regarding the effectiveness of trial counsel were reasonable applications of clearly established federal law.

2. Appellate Counsel

Petitioner contends that he was denied the effective assistance of counsel on direct appeal because his appellate counsel did not argue that the trial court erred by failing to (a) give a sudden passion jury instruction during the punishment phase of trial and (b) suppress petitioner's statement because the statement was coerced and involuntary.   (Docket Entries No.1, No.2-1). Respondent contends that petitioner has not rebutted the findings and conclusions of the state habeas courts as required by the AEDPA and that his claim does not satisfy scrutiny under *Strickland*.  (Docket Entry No.18, page 28).

The state habeas court found that petitioner failed to demonstrate that his appellate counsel's performance was deficient or prejudicial and that the totality of representation he received on appeal was sufficient to protect his right to reasonably effective assistance of counsel.  (Docket Entry No. 14-52, page 3).  The Texas Court of Criminal Appeals denied relief on the findings of this court.

An accused is constitutionally entitled to effective assistance of counsel on direct appeal as a matter of right.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  Claims of ineffective assistance of counsel are determined by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Smith v. Murray*, 477 U.S. 527 (1986).  To establish that appellate counsel's performance was deficient in the context of an appeal, petitioner must first show that his attorney was objectively unreasonable in failing to find arguable issues to appeal, *i.e.*, counsel unreasonably failed to discover non-frivolous issues and raise them.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Petitioner must then demonstrate that he was actually prejudiced by his counsel's errors.  *Id.* at 285-286; *see also Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000).  Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to

maximize the likelihood of success on appeal." *Robbins*, 528 U.S. at 288.  An ineffectiveness claim may be "based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent."  *Id*.  To demonstrate that a failure to raise an issue was deficient, a petitioner must show that a particular nonfrivolous issue was clearly stronger than issues that counsel did present.  *Id.*

To establish actual prejudice, petitioner must show a "reasonable probability" that, but for his counsel's deficient performance, "he would have prevailed on appeal."  *Robbins*, 528 U.S. at 285.  Prejudice cannot be demonstrated by a failure to raise meritless issues on appeal.  *See Williams v. Collins,* 16 F.3d 626, 634–35 (5th Cir. 1994) (when issue is without merit, failure to raise issue on appeal cannot satisfy *Strickland's* prejudice requirement).

### a. Sudden Passion

Petitioner contends his appellate counsel was deficient in failing to brief the state district court's denial of his request for a sudden passion jury instruction because the record shows that he and complainant engaged in a scuffle in the car that was precipitated by a discussion about business and complainant's threat to kill petitioner.  (Docket Entry No.2-1, pages 11-15).

Under Texas law, a defendant may argue during the punishment phase of trial "that he caused the death while under the immediate influence of sudden passion arising from an adequate cause."  *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005).  "An instruction on sudden passion is proper only when the sudden passion was directly caused by and arose out of provocation by the deceased at the time of the offense."  *Id.* at 570.  "[P]assion that is solely the result of former provocation does not qualify."  *Id.* citing TEX. PEN. CODE ANN. § 19.02(a)(2).

The record shows that petitioner's trial counsel requested an instruction on sudden passion and the state district court heard argument from both parties.  (Docket Entry No.14-30, pages 4-12).  The state district court explained that under state law a defendant is not entitled to a

jury instruction on sudden passion "'unless there was evidence that the offense occurred under the influence of sudden passion arising from an adequate cause.'"  (*Id.*, page 12).   In denying the instruction, the state district court further explained that the totality and context of petitioner's videotaped statement showed that "at the time of the stabbing he was under the same general fear that he had been in over a period of two or more weeks and that he had armed himself accordingly." (*Id.*, page 13).

The record supports the state district court's conclusion and the denial of the requested instruction.[18]  (Docket Entry No.36, pages 24-42).  Petitioner, therefore, fails to show that this issue was clearly stronger than other issues presented on direct appeal or that he would have prevailed on appeal.  Therefore, petitioner's appellate counsel's failure to brief the sudden passion issue on appeal did not constitute deficient performance that would render her representation ineffective.

## b. Suppression of Petitioner's Oral Statement

Petitioner contends his appellate counsel's performance was deficient because she failed to challenge on appeal the state district court's denial of his Motion to Suppress Statements on grounds that his oral statement was coerced and involuntary.  (Docket Entry No.2-1, pages 20-29).   The record shows that petitioner's appellate attorney raised two issues with respect to petitioner's Motion to Suppress Statements:

---

[18] When asked by police officers about his injuries, petitioner indicated that when he pulled his knife out, complainant cut him, and then he cut complainant.  (*Id.*, page 31).  Petitioner, however, did not respond to questions about cutting complainant's neck but expressed disbelief that complainant was dead.  (Docket Entry No.14-36, pages 33-34).  When asked if he were so angry, enraged, and emotionally upset that he lost control and cut complainant's throat, petitioner asked, "So, what am I looking at?"  (*Id.*, page 35).  The only explanation petitioner offered was that complainant was talking about how complainant, his parents, or a hired professional was going to kill petitioner.  (*Id.*, page 37).  When asked a second and third time if he was so enraged that he lost control, petitioner asked if this was a homicide case. (*Id.*, pages 40-42).

Petitioner's mother testified that in March 2006, a couple of months before the incident, petitioner expressed to her that he was in fear of life from complainant.  (Docket Entry No.14-26, pages 32-33).  She noticed that petitioner appeared to very sad and just hung around the house.  (*Id.*, page 34).  She indicated that petitioner's fear had grown worse before the incident.  (*Id.*, pages 38, 42).

> In his first issue, appellant contends that the trial court erred by denying his motion to suppress his statements because appellant was in custody and 'had clearly invoked his right to an attorney, in violation of state law and the Constitution.'  In his third issue, appellant contends the trial court erred in failing to suppress his statement 'because he was in custody at the time it was given and he was not given his *Miranda* warnings in violation of state law and Constitution.'

*Mbugua v. State*, 312 S.W.3d 657, 662 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (footnote omitted).  The Court agrees with respondent that appellate counsel's invocation of *Miranda* and the Constitution raises the issue of voluntariness and police overreaching.  (Docket Entry No.18, page 30).  Moreover, as previously discussed, petitioner's claim that his statement was involuntary is not supported by the record.

Petitioner fails to rebut the state habeas courts' findings with respect to his appellate counsel's representation.  Accordingly, respondent is entitled to summary judgment as a matter of law on this claim.

## III. CERTIFICATE OF APPEALABILITY

A certificate of appealability from a habeas corpus proceeding will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This standard "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotations and citations omitted).  Stated differently, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*; *Beazley v. Johnson*, 242 F.3d 248, 263 (5th Cir. 2001).  On the other hand, when denial of relief is based on procedural grounds, the petitioner must not only show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the

district court was correct in its procedural ruling." *Beazley*, 242 F.3d at 263 (quoting *Slack*, 529 U.S. at 484); *see also Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).  A district court may deny a certificate of appealability, sua sponte, without requiring further briefing or argument. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  The Court has determined that petitioner has not made a substantial showing of the denial of a constitutional right.  Therefore, a certificate of appealability from this decision will not issue.

### IV. CONCLUSION

Finding no unreasonable application of clearly established federal law in the record of the state proceedings, the Court ORDERS the following:

1. Respondent's motion for summary judgment (Docket Entry No.18) is GRANTED.

2. Petitioner's petition for federal habeas relief is DENIED.

3. A certificate of appealability is DENIED.

4. All other pending motions, if any, are DENIED.

5. This habeas action is DISMISSED with prejudice.

The Clerk will provide a copy to the parties.

SIGNED at Houston, Texas, this 26th day of September, 2012.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE